# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| L-5 HEALTHCARE PARTNERS, LLC, | ) | |
| | ) | |
| Plaintiff, Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0412-NAC |
| | ) | |
| ALPHATEC HOLDINGS, INC., | ) | |
| | ) | |
| Defendant, Counterclaim Plaintiff. | ) | |

## MEMORANDUM OPINION

Date Submitted: June 27, 2024
Date Decided: August 21, 2024

William M. Lafferty, D. McKinley Measley, Thomas P. Will, Alexandra M. Cumings, MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, Delaware; Antonio Yanez, Jr., Brady Sullivan, WILLKIE FARR & GALLAGHER LLP, New York, New York; Alexander L. Cheney, WILLKIE FARR & GALLAGHER LLP, San Francisco, California; *Counsel for Plaintiff and Counterclaim Defendant L-5 Healthcare Partners, LLC.*

Philip A. Rovner, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Krista M. Enns, Edward C. Wipper, BENESCH FRIEDLANDER COPLAN & ARONOFF LLP, New York, New York; *Counsel for Defendant and Counterclaim Plaintiff Alphatec Holdings, Inc.*

**COOK, V.C.**

This is a post-trial decision on the appropriate remedy to award for a breach of contract where the parties agreed, in the contract, to a specific performance remedy provision. The plaintiff invested $25 million in the defendant in 2017 in exchange for "certain warrants" and preemptive rights. The parties agree that, in entering a warrant-based lending agreement with a third-party lender, the defendant breached its obligations to the plaintiff under the preemptive rights provision. That provision required the defendant to "first offer" the plaintiff pro rata participation in the issuance of any such warrant "at the same price and on the same terms" as it offers to anyone else. Trial was held to determine whether specific performance is an appropriate remedy and, if so, to determine what specific performance would require on the facts at issue here.

Consistent with the terms the parties bargained for and Delaware's strong contractarian policies, specific performance is the appropriate remedy. And indeed, that is the equitable result here. To place the parties closest to where they would be had the defendant performed at the time performance was due, specific performance requires the defendant to offer to sell the plaintiff a pro rata warrant in exchange for the value the warrant had at the time of the breach.

1

# I.     FACTUAL BACKGROUND

This decision follows then-Vice Chancellor McCormick's ruling on a motion for partial judgment on the pleadings (the "Ruling").[1]  Defendant Alphatec Holdings, Inc. ("Alphatec") entered a Securities Purchase Agreement (the "SPA") with Plaintiff L-5 Healthcare Partners, LLC ("L-5") on March 8, 2018.[2]  Following the Ruling, the parties agree Alphatec breached the SPA by failing to perform its obligations under a preemptive rights provision contained therein (the "Preemptive Rights").  The record also supports that conclusion.  The fact record set forth below is narrowed to those issues relevant to my determination of the appropriate remedy.

## A.     The SPA

Under the SPA, in exchange for a $25 million investment, L-5 received "25,000 shares of Alphatec preferred stock," two board seats, "certain warrants[,]" and preemptive rights.[3]  "In May of 2018, L-5's preferred stock was converted to common stock and L-5 became Alphatec's largest s[tock]holder."[4]

---

[1] *L-5 Healthcare P'rs, LLC v. Alphatec Hldgs., Inc.*, C.A. No. 2019-0412-NAC, Docket ("Dkt.") 39, Mem. Op. ("Ruling").

[2] *See* Dkt. 174, Pl. L-5's Post-Trial Br. ("Pl.'s OB") at 38; Dkt. 177, Def. Alphatec's Post-Trial Answering Br. ("Def.'s AB") at 43.

[3] Dkt. 158, Pre-Trial Stipulation and Order ("Stip.") ¶ 30; *see also id.* ¶¶ 29, 39; J58 ("SPA").  Notwithstanding the parties' inconsistent use of "warrants" (plural) and  warrant (singular), where practicable, I will use the singular reference when referring to an individual warrant to purchase shares of Alphatec common stock.  *Compare id.* ¶ 30, *and* Pl.'s OB at 1 n.1, *with* Def.'s AB at 1.

[4] Stip. ¶ 31.

Section 4.18(a) of the SPA sets out the Preemptive Rights. It requires that if Alphatec "authorizes the issuance and sale of" any "common stock equivalents" (which includes warrants),[5] it must "first offer to sell" L-5 a pro rata portion of the securities at the "same price and on the same terms" as it sells to anyone else.[6]

Section 4.18(a) provides in full:

> Immediately following the Closing, and for so long as the LI Group beneficially owns such number of shares of Common Stock on a fully diluted basis (calculated in accordance with Section 4.ll(h)) equal to or greater than [12.5%], if [Alphatec] *authorizes the issuance and sale of any* Common Stock or *Common Stock Equivalents* (other than any Exempt Issuance), *[Alphatec] will first offer to sell to [L-5], a pro rata portion of such securities* equal to the percentage determined by dividing (i) the number of shares of Common Stock held by the LI Group (determined on a fully-diluted basis (calculated in accordance with Section 4.1l(h)), by (ii) the total number of shares of Common Stock then outstanding (determined on a fully-diluted basis (calculated in accordance with Section 4.11(h)). *The members of the LI Group (as determined by [L-5]) will be entitled to purchase all or part of such stock or securities at the same price and on the same terms as such stock or securities are to be offered to any other Person.*[7]

---

[5] *Id.* ¶ 33 ("Common Stock Equivalents 'means any securities of the Company . . . which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, any . . . warrant or other instrument that is at any time convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock.'").

[6] SPA § 4.18(a).

[7] *Id.* (emphases added). The parties agree that, at the time Alphatec breached the SPA, L-5 "held approximately 23.4% of Alphatec common stock on a fully diluted basis, calculated in accordance with Section 4.11(h)" and "[t]here is no Exempt Issuance at issue in this case." Stip. ¶ 34; *see also* SPA § 11(a). As used in the SPA, "LI Group" means L-5 "together with its Affiliates and its and its Affiliates' respective members, stockholders, owners, equity holders and family members . . . ." SPA §§ 1.1, 4.11(a).

The Preemptive Rights were designed to serve two separate purposes. First, they "preserve[d L-5's] ownership" by preventing dilution in the event Alphatec were to issue "equity-linked securities."[8] Second, they allowed L-5 to ride the upside and "participate in the turnaround story that [it] had invested" in.[9]

One additional provision in the SPA bears noting. Section 5.15 sets out a specific performance remedy provision that entitles the parties to specific performance of the terms of the agreement in the event of breach. Section 5.15 provides:

> "Remedies. In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages . . . [L-5] and [Alphatec] will be entitled to specific performance under the Transaction Documents. The parties agree that monetary damages may not be adequate compensation for any loss incurred by reason of any breach of obligations contained in the Transaction Documents and hereby agree to waive and not to assert in any Action for specific performance of any such obligation the defense that a remedy at law would be adequate.[10]

The SPA's terms are the product of significant, deliberate negotiations.

---

[8] Trial Tr. 9:7–15 (Segal).

[9] *Id.*

[10] SPA § 5.15. "Transaction Documents" includes the SPA. *See* SPA § 1.1. "Action" means "material action, suit, inquiry, notice of violation, proceeding or investigation pending or, to the knowledge of [Alphatec], threatened against or affecting [Alphatec], any Subsidiary or any of their respective properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) . . . ." SPA §§ 1.1, 3.1(j).

4

## B. The 2018 Agreement

Soon after entering the SPA, Alphatec again found itself seeking further financing. This time, it needed funds to repay a debt it owed to a competitor.[11] In September 2018, non-party Squadron Medical Finance Solutions LLC ("Squadron") offered Alphatec financing to pay off the debt.[12] Negotiations ensued. And on November 6, 2018, Alphatec entered a five-year secured term loan with Squadron for $35 million (the "2018 Agreement").[13] Alphatec secured the loan with a first lien on "substantially all of [its] assets except for its accounts receivable."[14] Under the 2018 Agreement, Alphatec agreed to issue Squadron a warrant to purchase 845,000 shares of Alphatec common stock at a $3.15 per share strike price, which it subsequently issued (the "2018 Warrant").[15]

Alphatec did not offer L-5 pro rata participation in the 2018 Warrant that it issued to Squadron, and L-5 did not seek to enforce its Preemptive Rights as to the 2018 Warrant.[16]

---

[11] Stip. ¶¶ 40–43.

[12] *Id.* ¶ 44.

[13] *Id.* ¶ 45; J104 ("2018 Agreement"). The parties explain the 2018 Agreement as comprised of two parts. The first part is the secured term loan described above. "The secured term loan that was part of the 2018 Agreement had a five-year maturity and bore interest at LIBOR + 8% with a floor of 10% and a ceiling of 13%." Stip. ¶ 46. The second part is "an inventory financing agreement for $3 million." *Id.* ¶ 45.

[14] Stip. ¶ 46; 2018 Agreement.

[15] Stip. ¶¶ 46–47.

[16] *Id.* ¶ 48.

5

### C. The 2019 Agreement

Notwithstanding the SPA and the 2018 Agreement, Alphatec, for a third time, found itself in need of funding. This time, it needed to secure an additional $20 million in funding availability by the time it filed its 10-K on March 31, 2019.[17] Otherwise, it would face an unfavorable qualified going concern audit opinion.[18]

So, beginning in February 2019, Alphatec pursued a second lending arrangement with Squadron.

After catching wind of this second agreement, L-5 first sought to provide the required financing itself and ultimately made an offer on March 4, 2019. But the Special Financing Committee—a subcommittee of Alphatec's board of directors (the "Board")—rejected L-5's offer the next day.[19] Jeff Black (Alphatec's CFO) called Paul Segal (L-5's President and Manager) to relay the news and inform Segal that Alphatec was moving forward with a Squadron deal.[20] During that call, Segal promptly asserted L-5's Preemptive Rights.[21] And indeed, Tyson Marshall—Alphatec's then-Associate General Counsel—had previously flagged Section 4.18 as

---

[17] J133 at 15; Trial Tr. 11, 51–52 (Segal).

[18] J133 at 15; Trial Tr. 11, 51–52 (Segal).

[19] *See, e.g.*, J159 (February 8, 2019, email from Segal to Patrick Miles (Alphatec's CEO) explaining that L-5 had "begun internal discussions on potential structures to provide capital to [Alphatec] to fund its business plan over the next 12 months."); Trial Tr. 101–102 (Segal) (describing the March 4, 2019 offer); J223 (Special Financing Committee's March 5, 2019 Meeting Minutes); Stip. ¶ 57.

[20] *See* Stip. ¶ 58; J225; J226; J227.

[21] *See* J441 (Black Dep.) at 132–33; J242; J251.

being among the "most problematic" provisions in the SPA for structuring a Squadron deal that required certain warrant issuances.[22]

Alphatec was aware of L-5's rights and its obligations under the SPA.[23] Yet, on March 7, 2019, after an affirmative vote by the Board, Alphatec signed a term sheet with Squadron (the "Term Sheet").[24] This sparked a wave of communications between Alphatec and L-5. L-5 repeatedly asserted the Preemptive Rights under the SPA.[25] Alphatec, on the other hand, took the position in its communications with L-5 that it was "premature" for L-5 to raise the Preemptive Rights and that it would address the Preemptive Rights at a later time.[26]

This notwithstanding, Alphatec tried to get L-5 to sign an acknowledgment and reservation of rights, providing that "[L-5] hereby agrees and acknowledges that" the terms in the Term Sheet and the financing agreement it contemplates do not give rise to a "Preemptive Right event under Section 4.18 of the [SPA]."[27] L-5 refused. In

---

[22] *See* J168.

[23] *See, e.g.*, J242.

[24] J420 at 35, 59–60.

[25] *See, e.g.*, Stip. ¶ 60; J258 ("Can you please let us know how [Alphatec] intends to implement the preemptive rights?"); J277 ("Following up to see if you've made any progress on the Squadron loan and how to address L-5's preemptive rights under Section 4.18 of the 2018 SPA. We're prepared to engage promptly . . . .").

[26] *See, e.g.*, J277 ("[I]t is premature to address L-5's participation rights under Section 4.18 of the 2018 SPA . . . ."); *see also* J420 at 37 ("premature at that time").

[27] J295. Alphatec believed that if L-5 signed the acknowledgment and reservation of rights, L-5 would have waived the claims it now brings in this action. *See* Trial Tr. 546 (Marshall) (Q. "So meaning if L-5 had signed this version two, they would have waived the

7

the meantime, while telling L-5 it was "premature" to assert its rights, Alphatec's communications with Squadron reflect its belief that either L-5 did not have Preemptive Rights to assert or its Preemptive Rights did not apply.[28] And Alphatec's internal communications reflect the same—albeit in more colorful language.[29] Alphatec's General Counsel explained succinctly that Alphatec "[was]n't going to engage with L5 (at all) prior to getting the deal done. We'll see when/whether/how we engage down the road, but however it goes down, I predict pain."[30]

claim that they are asserting today?" A. "That's correct."). As the predicate for seeking such waiver, the acknowledgment and reservation of rights explained that the Term Sheet and financing agreement contemplated therein did "not obligate [Alphatec] to authorize the issuance and sale of any Common Stock or Common Stock Equivalents . . . and, as such, d[id] not constitute a Preemptive Right event" under the SPA. J295. This Court would later reject this idea in the Ruling, as it relates to the eventual, second transaction Alphatec entered with Squadron. *See* Ruling at 15 ("Alphatec's interpretation does not work.").

[28] J276 (Email from Black to David Pelizzon (Squadron's President) stating: There is "[n]o real update from counsel on the L[-]5 pre-emptive rights discussion, other than that we continue to take the position that it does not apply . . . ."); J286 (Email from Black to Pelizzon: L-5 "is interested in preserving any participation rights [it has] (we think they have none) . . . ."); J288 ("if these rights even exist at all, which we do not agree they do").

[29] *See, e.g.*, J309 (Email from Miles to Black: "Agreed with all said…d'bags….we owe them no explanation." (ellipses in original)); *id.* ("bastards"); *id.* ("They're being jackasses. We'll continue to ignore them."); *id.* ("In other words, #FUL5."); J305.

[30] J305.

While these communications were ongoing, Alphatec sought to avoid triggering the Preemptive Rights.[31] To do so, it styled the new agreement as an amendment to the 2018 Agreement.[32]

On March 27, 2019, Alphatec and Squadron "signed the First Amendment to Credit, Security and Guaranty Agreement" (the "2019 Agreement").[33] "[T]he terms of the 2019 Agreement tracked the terms of the term sheet" under which "Squadron agreed to make available to Alphatec an additional $30 million term loan[,]" secured by "the same security interest as granted to Squadron" under the "2018 Agreement."[34] But "if and when Alphatec drew on that additional credit facility, Alphatec would then issue to Squadron warrants to purchase 4,838,710 shares of Alphatec common stock at $2.17 per share (with a seven-year term)."[35] "Unlike the 2018 Agreement,

---

[31] *See, e.g.*, J241 (requesting the inclusion of specific language to avoid triggering Preemptive Rights); J238 (Marshall telling Squadron's outside counsel he "want[ed] to make sure the terms" of the proposed Squadron agreement were "all harmonious with [Alphatec's] existing obligations[,]" which Marshall followed immediately by asking whether Squadron envisions the deal as "a separate (new) term loan in addition to the credit facility currently in place" or as "an amendment to the current credit facility."); J247 (suggesting it was Alphatec's "preference as well" to structure the deal as an amendment to the 2018 Agreement); J323.

[32] Recall that, as discussed above, L-5 did not assert its Preemptive Rights over the 2018 Agreement, and Alphatec failed to "first offer" L-5 pro rata participation therein. *But see* SPA § 5.5 ("No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any party to exercise any right hereunder in any manner impair the exercise of any such right.").

[33] Stip. ¶ 64; J304 ("2019 Agreement").

[34] Stip. ¶¶ 65, 68.

[35] *Id.*

9

Alphatec was not obligated to draw on the loan, although a failure to draw on the loan by June 30, 2019 would trigger a requirement that Alphatec pay $300,000 to Squadron."[36]  For "tax purposes," the 2019 Agreement provides that the warrant "issue price" is "equal to $1.98."[37]

On June 13, 2019, Alphatec "made its first draw pursuant to the 2019 Agreement" and "issued 4.8 million warrants to Squadron" (the "2019 Warrant").[38] This was followed by a second, final draw "in the amount of $20 million" on April 2, 2020.[39]

### D.    The Proposal

On April 29, 2019, Craig Hunsaker (Alphatec's General Counsel) wrote to L-5 "to formally respond to L[-]5's claim to Section 4.18 preemptive rights."[40]  Therein, Hunsaker explained that Alphatec "do[es] not believe Section 4.18 applies, nor was it intended to apply, to an amendment to an existing credit facility."[41]  Thus, Hunsaker wrote, "[Alphatec's] position is that Section 4.18 does not—and cannot—apply to the March 2019 amendment."[42]  On May 14, 2019, after again asserting Alphatec's belief

---

[36] *Id.* ¶ 66.

[37] 2019 Agreement § 3(D)(e)(ii).

[38] Stip. ¶ 70.

[39] *Id.* ¶ 71.

[40] J323.

[41] *Id.*

[42] *Id.*

that the Preemptive Rights did not apply, Hunsaker further tried to explain that even if the Preemptive Rights did apply, it would "not permit L-5 to meddle" with or "retroactively insert itself into" Alphatec's "existing contractual obligations . . . with Squadron."[43]  Put another way, after having asserted it was "premature" for L-5 to raise its Preemptive Rights before Alphatec entered the 2019 Agreement, Alphatec changed its tune to argue that it was seemingly too late to cut L-5 in (assuming the Preemptive Rights even applied).

Nonetheless, on May 17, 2019, Alphatec proposed a blended terms transaction to address L-5's Preemptive Rights (the "Proposal").[44]  The Proposal was contingent on approval by both Squadron and the Board[45] and sought to blend the terms of the 2018 Agreement and the 2019 Agreement to force L-5 to participate in both.[46]

---

[43] J372.

[44] J344; J375.

[45] *See* J344; J375.

[46] *See* Ruling at 7–8 ("The Proposal sought to replicate the price and terms of the 2018 Agreement and the 2019 Agreement together.  To that end, it required that L-5 initially make a first term loan of $11,550,137 in exchange for warrants to purchase 256,839 Alphatec common shares at $3.15 per share—the exercise price set forth in the 2018 Agreement.  It then required that L-5 commit to make a second term loan of $9,118,529.  Upon Alphatec's draw on the second term loan, L-5 would receive warrants to purchase 1,470,731 shares of Alphatec common stock at $2.17 per share—the exercise price set forth in the 2019 Agreement." (footnotes omitted)).

### E. Litigation And Post-Litigation Developments

"On June 4, 2019, L-5 filed a Verified Complaint against Alphatec" (the "Complaint").[47] Therein, L-5 asserts three claims. In Count I, L-5 seeks a declaration that Alphatec must offer it the opportunity to participate in the 2019 Agreement at the same price and on the same terms it provided to Squadron. In Count II, L-5 asserts a breach of contract claim based on Alphatec's failure to offer it the opportunity to participate in the 2019 Agreement. In Count III, L-5 seeks a declaration that Alphatec must indemnify it for damages, losses, and expenses incurred as a result of Alphatec's breach and must reimburse L-5 for reasonable attorneys' fees and other costs and expenses.

On July 30, 2019, Alphatec filed its answer and affirmative defenses "and asserted two counterclaims seeking declarations that mirror the relief sought in Counts I and II of the Complaint."[48] L-5 answered the counterclaims on September 18, 2019.[49]

On October 12, 2020, the Court issued the Ruling—granting in part and denying in part L-5's motion for partial judgment on the pleadings.[50] This Court concluded that "L-5 is entitled to a declaration that the 2019 Agreement and 2019

---

[47] Stip. ¶ 69.

[48] Ruling at 11; *see also* Dkt. 11.

[49] Dkt. 14.

[50] Stip. ¶ 72.

[Warrant i]ssuance triggered L-5's [Preemptive Rights] and that the Proposal did not constitute an 'offer' compliant with Section 4.18(a) of the [SPA]."[51] It explained that the Proposal was not an "offer," as required by Section 4.18(a) since it remained subject to approval by Squadron and the Board and thus did not create the right of acceptance in L-5.[52] But the Ruling did "not resolve Alphatec's affirmative defenses, what terms and conditions would be required to match Alphatec's 2019 Agreement with Squadron, or whether L-5 is entitled to reasonable attorneys' fees and other costs."[53]

After the Ruling, the parties agree Alphatec breached Section 4.18(a) of the SPA.[54] The parties also agree the attorneys' fees issue is suitable for resolution after trial.[55] This case was reassigned to me on August 9, 2022.[56] Trial was held from January 29 to 31, 2024, and I heard post-trial oral argument on June 27, 2024.

---

[51] Ruling at 22.

[52] *See id.* at 15–19.

[53] *Id.* at 22.

[54] Pl.'s OB at 38; Def.'s AB at 43–44.

[55] *See* Stip. ¶ 114.

[56] Dkt. 54.

## II.  LEGAL ANALYSIS

Two issues are before me: (1) whether L-5 is entitled to specific performance and (2) if so, what does specific performance require.[57]

### A.  L-5 Is Entitled To Specific Performance

To say that Delaware prides itself on the contractarian nature of its law risks understatement: ["]This jurisdiction respects the right of parties to freely contract and to be able to rely on the enforceability of their agreements; where Delaware's law applies, with very limited exceptions, our courts will enforce the contractual scheme that the parties have arrived at through their own self-ordering, both in recognition of a right to self-order and to promote certainty of obligations and benefits.["][58]

"Delaware courts are 'especially chary about relieving sophisticated business entities of the burden of freely negotiated contracts.'"[59]

Within this framework, public policy plays a limited role. "When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract." More significant interests "are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are

---

[57] Alphatec does not meaningfully raise its affirmative defenses in its post-trial briefing.  It does so only to assert a mitigation theory, which I address below.  By failing to raise its other affirmative defenses in its post-trial briefing, Alphatec waived them.  *Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 502 n.77 (Del. 2019) ("The practice in the Court of Chancery is to find that an issue not raised in post-trial briefing has been waived, even if it was properly raised pre-trial.").

[58] *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 565–66 (Del. Ch. 2023) (quoting *Ascension Ins. Hldgs., LLC v. Underwood*, 2015 WL 356002, at *4 (Del. Ch. Jan. 28, 2015)).

[59] *Id.*

undercut if citizens cannot rely on the law to enforce their voluntarily undertaken mutual obligations.[60]

Delaware courts extend these contractarian policies to their treatment of remedy provisions. Our courts have explained that "[w]here parties have expressed their expectations through a specific contractual remedy, Delaware law favors enforcing that remedy. Requiring parties to live with 'the language of the contracts they negotiate holds even greater force when, as here, the parties are sophisticated entities that bargained at arm's length.'"[61]

So it should come as no surprise that, where feasible, our courts favor enforcement of remedy provisions calling for specific performance. Indeed, as this Court explained, "Delaware is strongly contractarian, and the presence of a provision in favor of specific performance in case of breach . . . must be respected."[62] Thus, "[t]he existence of these provisions is sufficient to support a decree of specific performance, although a court can decline to issue one if there are supervening equities or other considerations."[63]

---

[60] *Id.* (footnote omitted).

[61] *In re Cellular Tel. P'ship Litig.*, 2021 WL 4438046, at *72 (Del. Ch. Sept. 28, 2021) (quoting *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at *7 (Del. Ch. July 9, 2002)); *see also CURO Intermediate Hldgs. Corp. v. Sparrow Purchaser, LLC*, 2024 WL 2847264, at *6 n.52 (Del. Ch. June 5, 2024) (raising foregoing principles in relation to specific performance remedy provision).

[62] *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 495 (Del. Ch. 2022) (quoting *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682, at *2 (Del. Ch. June 24, 2016), *aff'd*, 159 A.3d 264 (Del. 2017)).

[63] *Id.*; *see, e.g.*, *Gildor v. Optical Sols., Inc.*, 2006 WL 4782348, at *11 (Del. Ch. June 5, 2006).

Section 5.15 of the SPA is similar to specific performance provisions this Court has enforced in other decisions.[64] Consistent with the contractarian nature of Delaware law, I see no reason to depart meaningfully from those decisions.

Defendant argues specific performance remains a matter of judicial discretion.[65] That is correct.[66] "But when a party has agreed to" a "provision like the [s]pecific [p]erformance [c]lause, the party must establish a persuasive" and "case-specific" reason "why the clause should not be respected."[67] Here, Defendant fails to

_____

[64] *Compare Gildor*, 2006 WL 4782348, at *11 ("The Company and Stockholders shall be entitled to enforce their rights under this Agreement specifically, to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights existing in their favor. The parties hereto agree and acknowledge that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that the Company and any Stockholder may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance . . . in order to enforce or prevent any violation of the provisions of this Agreement."), *and Aizen*, 285 A.3d at 495 ("Section 10.8 of the Purchase Agreement provides that 'if any party violates or refuses to perform any covenant or agreement made by it herein, the non-breaching party shall be entitled, in addition to any other remedies or relief permitted herein, to specific performance of such covenant or agreement,' and 'each party hereby agrees not to raise any objections to the availability of specific performance ... to specifically enforce the terms and provisions of this Agreement, and to enforce compliance with the covenants and obligations in this Agreement.'"), *with* SPA § 5.15 ("In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages, each of the Purchasers and the Company will be entitled to specific performance under the Transaction Documents. The parties agree that monetary damages may not be adequate compensation for any loss incurred by reason of any breach of obligations contained in the Transaction Documents and hereby agree to waive and not to assert in any Action for specific performance of any such obligation the defense that a remedy at law would be adequate.").

[65] Def.'s AB at 24.

[66] *See Gildor*, 2006 WL 4782348, at *11 ("Specific performance, of course, is a form of relief available at the discretion of this court."); Restatement (Second) of Contracts § 357 cmt. c (Am. L. Inst. 1981) ("The granting of equitable relief has traditionally been regarded as within judicial discretion.").

[67] *Aizen*, 285 A.3d at 496.

16

provide any such persuasive basis. Instead, asks me to exercise my discretion against the great weight of our contractarian law to override the parties' clear, contractually stipulated intent and expectations as set forth in the SPA's terms.[68] That I will not do.

Alphatec knew of its obligation to "first offer" L-5 pro rata participation in "any" securities issuance well before it began discussions with Squadron over the 2019 Agreement. Indeed, one of Alphatec's own in-house attorneys flagged Section 4.18 of the SPA as one of the "most problematic" in structuring the 2019 Agreement with Squadron.[69] That is, in part, why Alphatec tried to structure the 2019 Agreement as an "amendment" to the 2018 Agreement—to escape its specific contractual obligation to L-5 under the SPA. But such "maneuvers to escape its contractual obligations offend basic notions of equity."[70] Moreover, notwithstanding L-5's significant protest, Alphatec went ahead with the 2019 Agreement—all the while telling L-5 it would address the Preemptive Rights later. But, as trial showed,

---

[68] *See Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008) ("[C]ourt[s] look[] to the most objective indicia of . . . intent: the words found in the written instrument.").

[69] J168.

[70] *Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at *27 (Del. Ch. Dec. 8, 2017) (addressing balancing of equities in action for specific performance of settlement agreement); *see also Bruckel v. TAUC Hldgs., LLC*, 2023 WL 4583575, at *15 n.166 (Del. Ch. July 17, 2023) (explaining that "a party 'cannot avoid its contractual obligations by creating, in bad faith, an outcome that technically satisfies the express terms of the [contract], but deprives plaintiffs of their legitimate expectations'" (alteration in original) (quoting *Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 639 (Del. Ch. 2011), *aff'd*, 76 A.3d 808 (Del. 2013))).

Alphatec had been talking out of both sides of its mouth. Despite telling L-5 it was "premature" to assert the Preemptive Rights, Alphatec was simultaneously representing to Squadron that it did not believe the Preemptive Rights applied. Sure enough, only after entering the 2019 Agreement did Alphatec change tack in its communications with L-5. This time, it took the position that either L-5's Preemptive Rights did not apply, or it was too late to raise them. As Plaintiff argues, this may come close to crossing into bad faith territory.

Preemptive rights and specific performance provisions mean something. When parties bargain for provisions like those here, they must expect to be held to those terms. In some instances, parties may persuade a court not to exercise its discretion in favor of enforcing a specific performance provision. Not so here. Defendant's dismal showing does not, to my mind, provide a compelling reason to deviate from the terms these sophisticated parties negotiated at arm's length.[71]

---

[71] Defendant's primary contentions on the balancing of equities—one of the factors considered when determining whether a specific performance decree is appropriate—are the following: (1) Section 4.18's purpose can no longer be given effect since it was only included to enable L-5 to avoid dilution, (2) L-5 explained to Alphatec how it could avoid triggering an anti-ratchet provision in the SPA (Section 4.19), (3) L-5 raised its Preemptive Rights shortly before Alphatec's planned earnings call, and (4) L-5 refused to negotiate with Alphatec after it entered the 2019 Agreement and/or tell Alphatec what terms it believed would satisfy Section 4.18. Def.'s AB at 37–40. The first argument fails because Section 4.18 was also designed to allow L-5 to participate in the upside of Alphatec's turnaround story. *See* Trial Tr. 9:7–15 (Segal); *see also Gildor*, 2006 WL 4782348, at *11 n.33. It further fails because the absence of the complete realization of a provision's purpose does not, per se, render performance pursuant to the provision meaningless or of no value. To the contrary, had Alphatec performed, the resulting performance would have been of significant value to L-5— even if it did not bring the complete realization of the non-dilutive purpose of Section 4.18 into full view. The second argument is not particularly clear. My best read of Defendant's argument is that by suggesting a method for Alphatec to navigate around the anti-ratchet provision, L-5 somehow tricked Defendant into believing it did not plan to enforce its

As the foregoing makes plain, I find no reason for my discretion to swing in Alphatec's favor. Instead, equity and our contractarian policies strongly support enforcing the specific performance provision. Alphatec breached the SPA in a manner demonstrating its clear, deliberate intention to deprive L-5 of its contract rights. L-5 upheld its end of the bargain—investing $25 million pursuant to the terms of the SPA in what, at the time, seemed like a failing Alphatec. In exchange, it bargained for Preemptive Rights. It is entitled to specific performance of those rights.[72]

---

Preemptive Rights or waived its rights under Section 4.18—notwithstanding L-5's numerous assertions of the Preemptive Rights and refusal to sign the acknowledgment and reservation of rights effectively releasing claims under Section 4.18 arising from the 2019 Agreement. And Alphatec's own internal communications show that even it did not view such interactions with L-5 to absolve it of its obligations under Section 4.18. *See, e.g.*, J242 ("L[-]5 will get on board with this not being a dilutive issuance (Section 4.19), assuming the equity grant is truly conditional (which it will be). However, L[-]5 is now raising the Preemptive Rights provision . . . ."). Even at best, this argument is unpersuasive. And any persuasive import this argument might have is lost in light of Section 5.5 of the SPA, which includes a no-continuing waiver clause. *See* SPA § 5.5. Defendant's third argument is similarly infirm. The notion that L-5 raised its Preemptive Rights too late ignores the fact that under Section 4.18(a), the burden is on Alphatec to "first offer" pro rata participation to L-5. Moreover, Defendant's argument is that L-5 waited opportunistically to assert the Preemptive Rights at a time that was inconvenient for Alphatec. But L-5 asserted its rights during the very same phone call in which it first learned Alphatec would not move forward with its financing proposal. In other words, it asserted the Preemptive Rights immediately upon learning Alphatec likely would be entering a transaction with Squadron to which the Preemptive Rights would apply. As to Defendant's fourth argument, the failure to tell Alphatec what terms it would accept or to otherwise negotiate other terms does not, under the facts here, suggest L-5 acted inequitably. This is especially true, as here, where L-5 acted well within its express contractual rights in doing so. I return to the text of Section 4.18(a), which plainly places the burden on *Alphatec* to provide L-5 with a compliant offer. It does not place the burden on *L-5* to explain the deal and what proposal would satisfy Alphatec's burden. Accordingly, I find none of Defendant's arguments compelling when considering the equities at play in this matter.

[72] Ordinarily, for a court to order specific performance, "a party must 'prove by clear and convincing evidence' that a legal remedy would be inadequate and that '(1) a valid contract exists, (2) he is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance.'" *Aizen*, 285 A.3d at 495 (quoting

*Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010)). Even under these requirements, I would remain inclined to find that specific performance is appropriate. *First,* there is no dispute that the SPA is a valid contract under Delaware law. *Second*, although Defendant challenges the extent to which L-5 was "ready, willing, and able" to perform at the time of the breach—seemingly due to non-committal language L-5 used in responding to the Proposal and in other negotiations—that does not show it was not ready willing and able to perform had Alphatec made a valid, compliant offer. *See also* J277 ("Following up to see if you've made any progress on the Squadron loan and how to address L-5's preemptive rights under Section 4.18 of the 2018 SPA. *We're prepared to engage promptly . . . .*" (emphasis added)). *Third*, as the foregoing shows, the equities clearly support enforcing the parties' bargained-for terms. And the presence of a specific performance provision, showing the parties' clear intentions, pushes the equities heavily toward enforcing the parties' intentions and expectations as set forth in the SPA. *See 26 Cap. Acq. Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 473 (Del. Ch. 2023) (addressing specific performance provision as a significant factor when assessing balancing of equities). As to the adequacy of a legal remedy—the specific performance remedy provision expressly bars Defendant from asserting the adequacy of a legal remedy. *See* SPA § 5.15. Given this contractual bar, Defendant does "not argu[e] that specific performance is inappropriate solely because there is an adequate remedy at law." Def.'s AB at 24 n.83 (citing SPA § 5.15). But, even if Defendant had contested this requirement, "[c]ontracts providing preemptive rights to purchase non-listed securities have given rise to specific performance orders . . . ." *Gildor*, 2006 WL 4782348, at *11 & n.33 (explaining further "[t]his court has recognized that specific performance of a stock purchase is appropriate in situations where the stock is not available in the market, is unique, or has unique value to the purchaser." (citing *Amaysing Tech. Corp. v. Cyberair Commc'ns, Inc.,* 2004 WL 1192602, at *3 (Del. Ch. May 28, 2004) and *Hazen v. Miller*, 1991 WL 244240, at *5–6 (Del. Ch. Nov.18, 1991))); *see also* Restatement (Second) of Contracts ch. 16, topic 3, intro. note ("Courts have been increasingly willing to order [specific] performance in a wide variety of cases in[clud]ing . . . contracts for the sale of a business or of an interest in a business represented by shares of stock . . . ."); 18A Am. Jur. 2d *Corporations* § 443 (May 2024 Update) ("Where a shareholder's preemptive rights have been violated by the issuance of new stock, the shareholder may choose one of a variety of remedies. One such remedy would be to purchase the shares at the same price paid by the new purchaser[.]" (footnote omitted)). In *Gildor*, then-Vice Chancellor Strine explained that, under the facts at issue there, "the stock was not available in the market, as [the defendant] was a small private company, and the preemptive rights gave [the plaintiff] the right to maintain his proportional share of the upside of a start-up firm." *Gildor*, 2006 WL 4782348, at *11 n.33. This suggests there would not be an adequate remedy at law. *See Hazen,* 1991 WL 244240, at *5–6 ("The remedy at law is inadequate if the stock is not generally available in the market place or is unique[.]"); 18A Am. Jur. 2d *Corporations* § 445 (May 2024 Update) ("The remedy of specific performance has been available to enforce a stockholder's preemptive right to stock where the stock cannot be purchased in the open market or has no market value."). But, in *Gildor*, the Court concluded that "[d]ue to the remedy provision of the Stockholder Agreement . . . [the Court] need not determine whether the specific nature of [the defendant's] stock would warrant specific performance in the absence of that provision." 2006 WL 4782348, at *11 n.33. The warrants at issue here are not, themselves, publicly available

## B.    What Specific Performance Requires

"An order of specific performance is intended to produce as nearly as is practicable the same effect that the performance due under a contract would have produced.  It usually, therefore, orders a party to render the performance that he promised."[73]  "An order of specific performance . . . will be so drawn as best to effectuate the purposes for which the contract was made and on such terms as justice requires."[74]  Thus, "[i]t need not be absolute in form and the performance that it requires need not be identical with that due under the contract."[75]

The Restatement (Second) of Contracts explains that:

> The objective of the court in granting equitable relief is to do complete justice to the extent that this is feasible.  Under the rule . . . the court has the power to mold its order to this end.  The form and terms of the order are to a considerable extent within the discretion of the court.  Its order may be directed at the injured party as well as at the party in

---

and at least arguably seem to be unique, valuable assets for which a legal remedy would be inadequate.  But, as the Court did in *Gildor* when addressing the breach of a party's preemptive rights under an agreement requiring specific performance and barring a defense of the availability of a legal remedy, I too see no need to characterize the exact nature of the warrant at issue here.

[73] Restatement (Second) of Contracts § 357 cmt. a; *see also Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1998 WL 71836, at *9 (Del. Ch. Feb. 4, 1998) ("The purpose of the specific performance remedy is to place the aggrieved party in the position that it would have been in but for the breach."); *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at *6 (Del. Ch. Jan. 24, 2005) ("[S]pecific performance is a specialized request for a mandatory injunction, requiring a party to perform its contractual duties."); Dkt. 183, Post-Trial Oral Arg. Tr. ("OA Tr.") at 66 ("I mean, the goal is to fashion a remedy to accomplish the purpose of the contract, right.").

[74] Restatement (Second) of Contracts § 358(1); *see also Snow Phipps Grp., LLC v. Kcake Acq., Inc.*, 2021 WL 1714202, at *55 (Del. Ch. Apr. 30, 2021) (quoting Restatement (Second) of Contracts § 358(1)).

[75] Restatement (Second) of Contracts § 358(1); *see also Snow Phipps*, 2021 WL 1714202, at *55.

21

breach. It may be conditional on some performance to be rendered by the injured party or a third person, such as the payment of money to compensate for defects or the giving of security. It may even be conditional on the injured party's assent to the modification of the contract that he seeks to enforce.[76]

The issue thus turns to a determination of what pro rata participation at the same price and on the same terms of the 2019 Agreement looks like and what specific performance it requires.

L-5 asks for an order requiring Alphatec to issue it a pro rata portion of the 2019 Warrant—*i.e.*, a warrant to purchase 1,133,160 shares of Alphatec common stock at a strike price of $2.17 per share and an expiration of June 21, 2026 (the "Warrant")—in exchange for no consideration ("Modified Scenario A").

Initially, in what it referred to as "Scenario A," L-5 requested a specific performance order that required Alphatec to issue the Warrant to it in addition to a payment of $73,267 in money damages.[77] L-5 calculated the money damages as follows: $814,662 in foregone interest on the $7,020,000 loan principle it would have lent to Alphatec if permitted pro rata participation in the 2019 Agreement, plus $1,997,173 in prejudgment interest on the principal and interest payments, less

---

[76] Restatement (Second) of Contracts § 358 cmt. a; *see also Vaughan v. Creekside Homes, Inc.*, 1994 WL 586833, at *1 (Del. Ch. Oct. 7, 1994) ("[I]n decreeing specific performance [this Court] will adjust the equities of the parties in such a manner as to put them as nearly as possible in the same position as if the contract had been performed *according to its terms.*" (emphasis and alterations in original) (quoting *Tri State Mall Assocs. v. A. A. R. Realty Corp.*, 298 A.2d 368, 371–72 (Del. Ch. 1972))); *Aizen*, 285 A.3d at 498 ("A court may place conditions on a decree of specific performance." (citing *Mumford v. Long*, 1986 WL 2249, at *4 (Del. Ch. Feb. 21, 1986) and *Valley Builders, Inc. v. Stein*, 193 A.2d 793, 799 (Del. Ch. 1963))).

[77] Pl.'s OB at 45–49.

$2,738,568 to account for its alternative rate of return.[78]  But L-5 "withdr[ew] its request for the prejudgment interest on the principal payments" at post-trial oral argument.[79]  Accounting for this adjustment, L-5's alternative rate of return would have yielded a return exceeding the remaining money damages sought.[80]  So, as of post-trial oral argument, L-5 abandoned its request for money damages on the loan and only seeks an order requiring Alphatec to issue the Warrant to it for no consideration (*i.e.*, Modified Scenario A).[81]

In the alternative to Modified Scenario A, L-5 seeks an order permitting L-5 to purchase the Warrant for $2.2 million—which, the parties agree, represents the value of the Warrant at the time Alphatec entered the 2019 Agreement ("Scenario B").[82]

Alphatec argues Modified Scenario A would create a windfall—giving L-5 the valuable Warrant for nothing.  If Alphatec performed and L-5 accepted a pro rata participation offer, L-5 would have taken on certain funding obligations to Alphatec.  So to give L-5 the Warrant seemingly for free would put L-5 in a manifestly better position than it would have been in if Alphatec performed.  And it would do so while

---

[78] *Id.*

[79] OA Tr. at 14.

[80] *Id.* at 14–15.

[81] *See id.*

[82] *See* Pl.'s OB at 46; J451 at 14, 19; Def.'s AB at 60.  The $2.2 million valuation is based on the issue price set out in the 2019 Agreement ($1.98) multiplied by the number of Alphatec shares of common stock issuable upon exercise of the warrant.  *See* J451 (Brown's Expert Report) at 14, 19; 2019 Agreement § 3(D)(e)(ii).

depriving Alphatec of the benefit of L-5 making funds available in exchange for the Warrant—irrespective of whether, as a practical matter, Alphatec was able to draw on those funds at the time as a result of terms set out in subsequent agreements.[83]

Moreover, it bears noting that in one of L-5's lead cases, the Court declined one form of the plaintiff's requested relief for the very reason that it would have created a "windfall" for the plaintiff.[84] At least from my view, Alphatec's criticism—that Modified Scenario A would create a windfall—seems like a valid concern.

But notwithstanding its criticism of Scenario A, Alphatec seems surprisingly on board with Scenario B. For its part, L-5 does not provide a meaningful basis to prefer Modified Scenario A over Scenario B. It asserts only that Scenario B would be an incomplete remedy because Scenario B would "depriv[e] it of the foregone value of the loan . . . ."[85] But, as of post-trial oral argument, L-5 has abandoned its request for any such money damages in conjunction with the loan that it previously requested as part of Scenario A. Now, it only seeks the Warrant in exchange for no consideration—Modified Scenario A. This leaves me with no unique reason to prefer Modified Scenario A over Scenario B. Since Modified Scenario A seems to provide L-5 better terms than the ones it bargained for, and L-5 provides no other reasons to

---

[83] *See* OA Tr. at 86–88.

[84] *Gildor*, 2006 WL 4782348, at *10.

[85] Pl.'s OB at 48.

24

prefer Modified Scenario A over Scenario B, the latter seems to place the parties closer to where they would have been had Alphatec performed in 2019.

As noted, Alphatec seems generally amenable to the use of Scenario B—albeit with an unprecedented twist. Alphatec's argument starts out well enough. In the beginning, it tracks the methodology of L-5's Scenario B. In that regard, the parties seem to agree that such a specific performance remedy—cash for the Warrant—is an appropriate way to resolve this matter. Indeed, as Alphatec explained at oral argument, "[i]f the Court is inclined to enter judgment awarding specific performance as a remedy, the only fair and equitable framework for a specific performance award is a cash payment in return for a warrant for the 1.1 million shares of Alphatec common stock at a strike price of $2.17."[86] Alphatec even agrees that, at the time it entered the 2019 Agreement, the Warrant would have been worth $2.2 million.[87] This all seems to make sense and, again, tracks L-5's Scenario B.

---

[86] OA Tr. at 21. Alphatec contends similarly in its briefing. It explains that of the alternative scenarios L-5's expert walked through, the ones that "arguably approximate what happened in 2019 are those under which L-5 'buys' the warrant from Alphatec for cash" since "requiring L-5 to buy the warrant confers some benefit on Alphatec." Def.'s AB at 51. Indeed, notwithstanding Alphatec's extensive briefing on the potential applicability of its blended terms Proposal, it raises the Proposal only in an attempt to show L-5 was not "ready, willing, and able" to perform at the time Alphatec's performance was due. Alphatec does not, however, suggest that, if I award specific performance, the decree should be one that tracks the terms in the Proposal or otherwise requires some blend of the terms in the 2018 Agreement and 2019 Agreement. Instead, its position is that a specific performance decree should only be a cash-for-Warrant exchange. *Id.*

[87] *See* Def.'s AB at 60; OA Tr. at 21 (discussing "the value of the [W]arrant" at the time of breach, "which was approximately $2.2 million").

But then Alphatec asserts that, by using an alternative rate of return to reduce the money damages that L-5 was seeking in addition to its request for specific performance under Scenario A, L-5 functionally concedes that it was required to "mitigate" Alphatec's breach.[88] So, Alphatec argues, L-5 should have purchased $2.2 million of Alphatec common stock to "mitigate" Alphatec's refusal to fulfill its Preemptive Rights obligation to L-5.[89]

Per Alphatec, since the value of its stock has increased considerably since 2019, if L-5 had invested in Alphatec stock at the time Alphatec breached the SPA, such a $2.2 million investment in Alphatec common stock would have increased by approximately $8.5 million.[90] Thus, the argument goes, L-5 should be required to pay Alphatec $10.7 million in exchange for the Warrant.[91]

Alphatec, however, can point to no case suggesting that a party has a duty to mitigate in the specific performance context.[92] Alphatec also points to no cases

---

[88] Def.'s AB at 57–61.

[89] *Id.*

[90] *Id.*

[91] *See id.*

[92] *See id.*; OA Tr. at 65–66. That said, the determination of whether to award specific performance remains a matter of judicial discretion, and, in fashioning a specific performance decree, courts remain free to "adjust the equities" as justice requires. *See Vaughan*, 1994 WL 586833, at *1; *Snow Phipps*, 2021 WL 1714202, at *55; Restatement (Second) of Contracts § 358(1). The other part of Alphatec's "windfall" argument follows from its assessment of risk asymmetry. In addition to the foregoing, Alphatec contends that ordering Alphatec to issue L-5 the Warrant in exchange for no consideration would produce a windfall because (a) L-5 did not take on any of the risk like Squadron did, thus "[w]ithout duplicating that risk, requiring Alphatec to issue warrants to L-5 as if L-5 loaned $7 million to Alphatec in 2019 is

26

suggesting that any such duty might require a plaintiff to mitigate a breach involving the issuance of a warrant by purchasing common stock—a different security with a different value proposition and a different risk profile.[93]

---

not at the same price and same terms as Squadron[,]" (Def.'s AB at 48) and (b) "Alphatec issued a warrant to Squadron in part to compensate Squadron for (1) taking the risk of losing all or part of its investment, and (2) holding a warrant for" what were by that point "underwater shares" (*Id.* at 49) that it received under the 2018 Agreement. L-5 counters that any failure to take on the risk Squadron donned was not of its own doing. So any blame for the Warrant being issued to L-5 risk-free would fall at Alphatec's feet since it was only because Alphatec breached the SPA that L-5 was wrongfully prevented from participating in the 2019 Agreement and taking on whatever risk may have accompanied such an investment. I find Plaintiff's position persuasive here. Whatever risk asymmetry Alphatec now complains of is a product of its own making and should not be construed to L-5's disadvantage. "[S]pecific performance will not usually be denied where the hardship is due to defendants' own acts or . . . was clearly foreseeable." *Tassette, Inc. v. M. A. Gerett, Inc., & Holmes E. Penn*, 1971 WL 1714, at *3 (Del. Ch. Feb. 5, 1971). Moreover, Alphatec provides no reason to believe that one lender taking on more risk than another should preclude enforcement of a "same price and on the same terms" provision conferring preemptive rights. And, to the extent one wishes to consider the relevant risk profiles at issue here, it bears noting that L-5 took on considerable risk in 2018 when it entered the SPA and invested $25 million in a then-floundering Alphatec. *See* TT590–91 (Brown); Restatement (Second) of Contracts § 364 cmt. b ("In determining the fairness of an exchange [to evaluate the appropriateness of a specific performance decree], account will be taken of the risks taken by both parties at the time the agreement was made."). As I noted at oral argument, Defendant's reading would have the Court believe specific performance of a "same price and on the same terms" provision may differ depending on who a third-party lender is. OA Tr. at 30–33. But such a reading of Section 4.18 is nowhere to be found. The risk Squadron bore "might explain why the terms [of the 2019 Agreement] exist, but it wouldn't have changed the terms" Alphatec was required to provide L-5 to comply with its obligation under the Preemptive Rights provision in the SPA. TT588 (Brown).

[93] *See* TT793 (Zurek) ("Q. Well, in other words, the warrant has option value that a share of stock does not. Is that fair? A. That's right. And you would only exercise it . . . early if you expected some events to diminish the value of the underlying shares, and then you may want to exercise it early or sell it in the market."); *see also* TT590–91 (Brown) (explaining how requiring L-5 to purchase Alphatec common stock would have imposed substantially more risk on L-5 than the SPA's bargained-for terms contemplated: "Q. But [Alphatec's expert] says that L-5 could have mitigated its losses by buying stock. You're aware of that; right? A. I am. It's just a different risk profile. I mean, this transaction contemplates a first lien loan to, you know, a company with a sub [$]60 [to] $70 million market cap that was faced with a going concern warrant. It's a very different risk profile to buy the stock versus to get first lien loan. Q. And what are some of those differences? A. Well, if you've got a first lien

27

Instead, Alphatec points only to L-5's use of an alternative rate of return to reduce the *money damages* L-5 sought.[94] Alphatec fails to prove its starting point— that L-5 concedes the applicability of mitigation principles to specific performance to exclude an alternative rate of return—since L-5's only purported use of such principles is limited to apply exclusively to the money damages part of the relief it sought.

But perhaps even more compelling is simply pausing to consider whether such "mitigation" would come remotely close to placing the parties in the positions they would have been in had Alphatec performed. Here, Alphatec argues that instead of lending it $7.02 million—which Alphatec would likely have repaid in full with

---

loan and it goes bankrupt, then you're sitting on the collateral package. You're at the top of the capital structure as opposed to at the bottom of the capital structure.").

[94] *See* OA Tr. at 64–67. Here, Alphatec's failure to provide any supporting authority for its position as to mitigation in this context "constitutes waiver of the issue." *Macrophage Therapeutics, Inc. v. Goldberg*, 2021 WL 2585429, at *4 (Del. Ch. June 23, 2021) ("'[C]ounsel is required to develop a reasoned argument supported by pertinent authorities.' '[F]ailure to cite any authority in support' of [a] legal argument . . . 'constitutes a waiver of the issue.'"). Alphatec tries to argue that a duty to mitigate should apply to limit the extent of a specific performance decree. It provides no support for that proposition and, indeed, some legal scholars suggest a duty to mitigate does not (or cannot) apply to an action for specific performance arising from breach of contract. *See, e.g.*, *Thomas S. Ulen, The Efficiency of Specific Performance: Toward A Unified Theory of Contract Remedies*, 83 Mich. L. Rev. 341, 390 (1984) ("With money damages there is an obligation on the breachee to mitigate his losses, and it is generally conceded that this is an efficient obligation. With specific performance there is no such obligation to mitigate, nor is it easy to see how such an obligation could be imposed under that contract remedy." (footnotes omitted)); *see also Ash Park, LLC v. Alexander & Bishop, Ltd.*, 783 N.W.2d 294, 310–12 (Wis. 2010). Here, the warrant is different from common stock. It is not a widget. And Alphatec agreed in the SPA not to argue remedies at law would be adequate. SPA § 5.15. If anything, Alphatec's mitigation argument comes across as an attempt to shoehorn legal remedy arguments into this action for specific performance, in seemingly yet another breach by Alphatec of its express contractual obligations.

28

interest and the Warrant to boot—L-5 should be required to now give Alphatec over

$10.7 million (*i.e.*, more than the combined value of the principal and interest on a

pro rata loan), which it will not repay and on which interest will not accrue, in

exchange for the same Warrant Alphatec concedes was worth $2.2 million at the time

it breached the SPA.[95]  This comes nowhere near what the parties bargained for and

seeks to shift L-5's contractual entitlement to benefit from the appreciation in

Alphatec's stock price since 2019 away from L-5 and toward the breaching party, *i.e.*,

Alphatec.

Alphatec asserted at oral argument that equity requires the Court to consider

the change in the value of the Warrant between 2019 and the present and to fashion

an order that takes into account the change in the value of Alphatec stock.[96]  But this

Court previously has declined to adjust the equities to account for an increase in value

of an asset that appreciated during a delay caused by a wrongful breach of contract

by a defendant's predecessor.  The Court explained that "had the contract been

performed" at the time performance was due, "the plaintiffs would have enjoyed all

of the appreciation in the value of the property, and any income derivable therefrom"

and adjusting the equities "would enable [the defendant] to profit by its predecessor's

---

[95] *See* OA Tr. at 95–96.

[96] *Id.* at 21 ("In fashioning that [specific performance] award we also respectfully submit that the Court must price the purchase of that warrant not only at the value of the warrant at the time of the alleged breach, which was approximately $2.2 million, but adding to the purchase price the amount L-5 would have realized if in March of 2019 it had made an alternative investment in Alphatec stock.").

29

wrongful breach and retention of the property."[97]  This seems to apply in equal force to the analogous facts and issues here.  Accordingly, I reject Defendant's argument that specific performance requires L-5 to purchase the Warrant for $10.7 million.

Nonetheless, the parties both seem generally amenable to an award consistent with L-5's Scenario B—Defendant only goes one step further to apply an unprecedented mitigation theory to the specific performance remedy.  And since L-5 provides no meaningful reason to prefer Modified Scenario A over Scenario B, I see no need to belabor this.  Accordingly, I will order that, consistent with Scenario B, Alphatec is to make available to L-5 a warrant to purchase 1,133,160 shares of Alphatec common stock at a $2.17 strike price and a June 21, 2026, expiration date.  And, in exchange, L-5 will have the choice of whether to purchase the warrant from Alphatec for $2.2 million or any portion thereof[98] (based on a $1.98 per share valuation) or to decline to do so.

---

[97] *Vaughan*, 1994 WL 586833, at *3 n.2; *see also Osborn*, 991 A.2d at 1162 ("[M]ere increase in land values, unaccompanied by other circumstances showing inequity, is not such hardship as justifies a court of equity in denying specific performance." (quoting *Cunningham v. Esso Standard Oil Co.*, 118 A.2d 611, 614 (Del. 1955))); *Esso Standard Oil Co. v. Cunningham*, 114 A.2d 380, 382–83 (Del. Ch.) (enforcing specific performance of an option for the sale of land that had increased substantially in value during the term of the option and stating that "[w]hile defendants have proved hardship in the sense that they would realize substantially more in a sale of their property at its present market value rather than at the option price, a modern court of equity cannot force a party to renegotiate a contract for the sale of land solely in the light of changes in land values occurring after the date of the contract[.]")), *aff'd*, 118 A.2d 611 (Del. 1955).

[98] *See* SPA § 4.18(a) ("The members of the LI Group (as determined by [L-5]) will be entitled to purchase *all or part of* such stock or securities at the same price and on the same terms as such stock or securities are to be offered to any other Person." (emphasis added)).

30

### III.      CONCLUSION

For the foregoing reasons, L-5 prevails in this action seeking enforcement of the terms and provisions of the SPA. It is entitled to specific performance in the manner described above. The parties are to confer on a form of order implementing this decision and to submit a joint letter advising the Court of any issues that may remain to be addressed.